# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

21ST CENTURY ONCOLOGY, INC.,

    *Plaintiff*,

v.                                   CASE NO.: 4:19cv298-MW/CAS

ASHLEY B. MOODY, in her official
capacity as Florida Attorney
General, and LAUREL M. LEE, in
her official capacity as Florida
Secretary of State,

    *Defendants*,

and

DR. MICHAEL KATIN

    *Intervenor*.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

In February 1954, the classic horror film *Creature from the Black Lagoon* was released.[1]  The plot is now a familiar trope: a prehistoric monster emerges from the fetid depths of a jungle swamp to terrorize a scientific expedition, kidnaps the girlfriend of one of the scientists, and is killed only after bringing the majority of the cast to various grisly ends.  As the real-world setting for the

---

[1] *Creature from the Black Lagoon* (Universal Pictures 1954).

eponymous lagoon, the filmmakers chose Wakulla Springs, Florida—a state park located less than fifteen miles from this Court's courtroom in Tallahassee.[2]

Sixty-five years later, Plaintiff contends, another monster has emerged, this time in the heart of Tallahassee itself. The primordial pool in question is the Florida Capitol, and the role of the hadean hominid is played by section 542.336, Florida Statutes, which the Florida Legislature adopted in its 2019 Session. *See* Ch. 2019-138, Laws of Fla. (2019) (adopting section 542.336). Section 542.336 declares that, when a particular entity employs or contracts with all physicians practicing a given specialty in a given county, any noncompete agreements between that entity and those physicians are void. Plaintiff, a company that employs a variety of physicians in several Florida counties, argues section 542.336 is pernicious special-interest legislation, crafted by lobbyists to allow a small group of its former employees to escape their non-compete agreements without serving any broader public good. Pursuant to 42 U.S.C. § 1983, Plaintiff seeks to enjoin application and enforcement of section 542.336 on the basis that it violates the Contracts

---

[2] The undersigned expressly disclaims any suggestion that Wakulla Springs at all resembles a fetid swamp. It is a large freshwater spring featuring cool waters, abundant wildlife, and a historic lodge and hotel. *See Edward Ball Wakulla Springs State Park*, Florida State Parks (Aug. 12, 2019), https://www.floridastateparks.org/parks-and-trails/edward-ball-wakulla-springs-state-park.

Clause, Due Process Clause, and Equal Protection Clause of the United States Constitution.[3] This Court denied Plaintiff's motion for temporary restraining order, ECF No. 8 (order), and the matter proceeded to a preliminary injunction hearing on August 9, 2019.[4] This Court concludes Plaintiff's Motion for Preliminary Injunction, ECF No. 3, is due to be **DENIED**.

## I

In full, section 542.336 provides:

> A restrictive covenant entered into with a physician who is licensed under chapter 458 or chapter 459 and who practices a medical specialty in a county wherein one entity employs or contracts with, either directly or through related or affiliated entities, all physicians who practice such specialty in that county is not supported by a legitimate business interest. The Legislature finds that such covenants restrict patient access to physicians, increase costs, and are void and unenforceable under current law. Such restrictive covenants shall remain void and unenforceable for 3 years after the date on which a second entity that employs or contracts with, either directly or through related or affiliated entities, one or more physicians who practice such specialty begins offering such specialty services in that county.

§ 542.336, Fla. Stat. (2019).

Plaintiff argues section 542.336 unconstitutionally impairs its noncompete agreements with its current and former employees, and that it is

---

[3] Plaintiff also alleged section 542.336 violated its rights conferred by the Florida Constitution, but this Court dismissed those claims on Eleventh Amendment grounds by previous order. ECF No. 32.

[4] On August 8, 2019, and without objection, this Court stayed this litigation with respect to Secretary Lee pending her appeal of this Court's denial-in-part of her motion to dismiss. ECF No. 51.

special interest legislation that does not serve any legitimate public purpose. Plaintiff also argues section 542.336 is unconstitutionally vague because it is unclear what is meant by "medical specialty," the three-year period of invalidity is ambiguous as a practical matter, and it is difficult for an employer to tell whether it is the sole employer of all physicians practicing a given specialty in a given county. Finally, Plaintiff contends section 542.336 violates Plaintiff's right to equal protection of the law by imposing an asymmetrical bar on noncompete agreements and by "facially target[ing] a few physician specialists, including Intervenor, for special dispensation." ECF No. 62 at 2.

## II

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quotation and citation omitted). A court may only grant such relief if the moving party shows "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). "No one factor, taken individually, is necessarily dispositive," but "the absence of an adequate showing with regard to any one

factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

This case turns on whether Plaintiff has shown a substantial likelihood of success on the merits. Because Plaintiff has not, at this stage, made the requisite showing as to any of its claims, this Court denies Plaintiff's motion for preliminary injunction.

## III

The Constitution prohibits the States from passing "any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10. The final clause quoted, known as the Contracts Clause,[5] "applies to any kind of contract." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). It is not, however, an absolute bar to legislation that affects contracts. Rather, the Constitution recognizes that contracts reflect parties' expectations about the future, and at times it may be necessary for a government to subordinate those expectations to the needs of the public's health, safety, and welfare. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978)

---

[5] As noted by *LL Liquor, Inc. v. Montana*, 912 F.3d 533, 537 n.2 (9th Cir. 2018), federal courts—including the United States Supreme Court—have "bounced between using the plural 'Contracts' and the singular 'Contract' when referring to this Clause." The Ninth Circuit concluded the plural form was appropriate because the article 10, section 1 of the Constitution says "Obligation of *Contracts*." (Emphasis added). Letters (and words) matter, especially in the Constitution. *See M'Culloch v. Maryland*, 17 U.S. 316, 407 (1819) ("[W]e must never forget that it is a *constitution* we are expounding."). This Court will likewise use the plural form.

(explaining the Contracts Clause "does not operate to obliterate the police power of the States").  Courts analyze impairment of contracts by applying

> a two-step test.  The threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship.  In answering that question, [courts] consider[] the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.  If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation.  In particular, [courts] ask[] whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

*Sveen*, 138 S. Ct. at 1821-22 (internal marks and citations omitted).  The severity of the impairment is both the focus of the first step and a means to calibrate the second step; that is, the more severe the impairment, the higher the level of scrutiny a court will apply.  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 n.31 (1987) (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)).  "The severity of the impairment measures the height of the hurdle the state legislation must clear.  Minimal alteration of contractual obligations may end the inquiry at its first stage.  Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation."  *Allied Structural Steel*, 438 U.S. at 245 (footnote omitted); *see also Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 897 (7th Cir. 1998) (analyzing the justifications advanced for the law at issue and concluding they were "hard to

take seriously"). "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves*, 459 U.S. at 412 (footnote omitted).

Contracts Clause jurisprudence also distinguishes between impairment of contracts between private parties and impairment of contracts to which the state government is itself a party. "Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 22 (1977). When the state is not a party to the affected contract, however, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 23. Therefore, when undertaking the second step of a Contracts Clause analysis in a case involving substantial impairment of a contract between private parties, a court will focus its analysis on the significance and legitimacy of the public purpose behind the impairment and show appropriate (though not absolute) deference to the legislature's choice of means to achieve that purpose.

Even assuming Plaintiff can overcome Defendants' and Intervenor's other arguments, this Court concludes Plaintiff has not shown a substantial likelihood of success on the merits. Section 542.336 substantially impairs Plaintiff's employment contracts, but it nevertheless does not violate the

Contracts Clause because it serves a significant, legitimate public purpose. Moreover, although Plaintiff claims section 542.336 is intended to serve the private benefit of a small special interest group rather than any legitimate public purpose, this Court concludes the record at this stage of proceedings does not support that contention.

The record reflects that the noncompete agreements at issue in this case are not standalone contracts but are instead considered part of the employment agreements between Plaintiff and the physicians it employs. *See, e.g.*, T. at 46;[6] *see also* Pl's Ex. 1. The record does not contain facts sufficient to allow this Court to estimate the dollar value of the noncompete agreements at issue, but it is clear their value to Plaintiff is not *de minimis* and the noncompete agreements are a significant feature of the employment contracts. T. at 115-16, 145.[7] By voiding the noncompete agreements, section 542.336 substantially impairs Plaintiff's employment contracts. It does not, however, render those contracts valueless. Section 542.336 does not undo the past performance of these employment contracts, and the employment contracts for Plaintiff's current employees remain valid under section 542.336 separate and

---

[6] The certified transcript of the August 9, 2019, preliminary injunction hearing will be cited as "T. at __" followed by the page number and, when relevant, the line number(s).

[7] For example, although Plaintiff has introduced an *exemplar* of the type of noncompete agreements at issue, Plaintiff has not introduced the *specific* employment contracts at issue, which the record reflects were each negotiated separately and may each contain unique terms relating to the noncompete agreements. T. at 48:1-8.

apart from the noncompete agreements. Section 542.336 is a significant impairment on Plaintiff's employment contracts, but not a total one. Therefore, this Court's will analyze the legitimacy and significance of the public interest behind section 542.336 in the second step of the Contracts Clause analysis with a higher level of scrutiny than quasi-rational-basis review, but lower than the heightened scrutiny applied to alleged impairments of state contracts.

In the second step of the Contracts Clause analysis in this case, the issue is whether section 542.336 serves a significant, legitimate public purpose. In the context of the Contracts Clause, a public purpose is "significant" in the context of its relation to the state's exercise of its police powers. *See Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38-41 (1940) (weighing the impairment of a contract against the exercise of the "power of the state to protect its citizens by statutory enactments affecting contract rights"). The legitimacy of an asserted public purpose supporting the impairment of a contract can be undercut by a showing that the challenged law is intended to confer a private benefit to special interest groups rather than serving the proffered legitimate interest. *See Energy Reserves*, 459 U.S. at 412; *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002) ("It is clear that the only real beneficiaries under the Act are the narrow class of dealers of agricultural machinery. [. . .] As the case law makes clear, such special

interest legislation runs afoul of the Contract [sic] Clause when it impairs pre-existing contracts."); *Chrysler*, 148 F.3d at 896-97 (analyzing whether the justifications advanced for a statute's public purpose were credible).

The ostensible public purpose of section 542.336 is to reduce healthcare costs and improve patients' access to physicians. *See* § 542.336, Fla. Stat. (2019); ECF No. 64 at 8 (Attorney General's post-hearing brief, stating "section 542.336 explicitly sets forth its own rational basis in declaring that the restrictive covenants addressed by it are not supported by a legitimate business interest, restrict patient access to physicians, and increase costs"). It is well settled that access to affordable healthcare is a legitimate state interest. *See, e.g.*, *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 592 (1906) ("We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, public morals, or the public safety."). Ensuring access to affordable healthcare is also a significant state interest. *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 191 (1st Cir. 1999) ("Health and safety are two mainstays of the police power."). The record reflects that increasing concentration and consolidation of physician services is a national trend that has the potential to both increase prices and raise problematic barriers to patients' access to treatment. *E.g.*, T. at 241-47.

Plaintiff counters that section 542.336 would not serve this goal and is furthermore not intended to do so. In support, Plaintiff submits that, until recently, Plaintiff employed all nine of the radiation oncologists practicing in Lee County, Florida, making Plaintiff the only provider of radiation oncology services in that county. T. at 34, 66-67, 74. All of those radiation oncologists were parties to noncompete agreements with Plaintiff. T. at 66:23-25. Within the past year, however, five of those nine radiation oncologists—including Intervenor—severed their relationships with Plaintiff. T. at 66, 103. Plaintiff's current employee (and sole fact witness), Dr. James Orr, testified that he is aware that some of those five physicians (he did not specify which, or how many) have begun to practice radiation oncology in Lee County in reliance on section 542.336. T. at 67:13-17. Plaintiff further notes that Intervenor is the sole officer of Special Committee for Healthcare Reform, LLC (SCHR), which was formed on April 1, 2019. ECF No. 44 Ex. A. On April 8, 2019, the Florida Senate Committee on Commerce and Tourism held a hearing on the amendment that ultimately became section 542.336. During this hearing, a lobbyist spoke in favor of section 542.336, apparently on behalf of SCHR. ECF No. 60-1 at 5.[8] In part, the lobbyist told the Senate Committee *"we've* tried to narrow this as much as possible. It's only specialists. It does not apply to

---

[8] The lobbyist explained SCHR "is a group of Florida physicians who are specialists who are subject to these noncompete clauses," but does not identify himself as appearing on SCHR's behalf. ECF No. 60-1 at 5.

family practice physicians." *Id.* at 6 (emphasis added). Attempting to connect the dots, Plaintiff contends these facts indicate section 542.336 was drafted by the lobbyist, acting on SCHR's behalf, for the sole purpose of allowing the five physicians who left Plaintiff's employ to escape their noncompete agreements.

At this stage, Plaintiff has not shown a substantial likelihood section 542.336 serves an illegitimate private interest rather than a legitimate public purpose. A lobbyist may have spoken on SCHR's behalf in support of the bill, but the Senate Committee also heard from a different lobbyist who opposed the bill on the grounds it would have "an unnecessary impact on the ability of hospitals and others to contract" and would result in "much litigation and many court decisions." ECF No. 60-1 at 4. The statements of both the bill's sponsor and the supporting lobbyist indicate section 542.336 was intended to address an issue of statewide importance. *Id.* at 3-6. It was narrowly tailored to affect specific types of physicians, but the record before this Court does not permit the inference that section 542.336 was narrowly tailored to affect specific *individual* physicians. The record also does not permit the inference that section 542.336 would only affect Plaintiff. Rather, it appears it would affect the noncompete agreement of any physician specialists in any county where one entity employs them all. Nothing in the record suggests Plaintiff is the only such entity in Florida; and although Plaintiff need not prove a negative and show absolutely that no other entity would be affected, it was

necessary for Plaintiff to offer at least *some* evidence of this to show a substantial likelihood of success on the merits. Further light may be shed on this issue as the case proceeds, but at the present stage Plaintiff has not shown section 542.336 is impermissibly designed to serve special interests.

Plaintiff also argues that section 542.336 is not justified by the State's interest in access to affordable healthcare because it does not actually serve that interest. During the hearing before this Court, the parties presented lengthy expert testimony concerning the likely economic effects and wisdom of section 542.336. Dr. David Argue testified for Plaintiff that prohibiting noncompete agreements like those at issue in this case was economically irrational and would have no effect on prices.[9] T. at 184, 198-200. In part, Dr. Argue based this conclusion on the premise that Plaintiff's prices are already competitive, and also on the separate premise that insurers in Florida negotiate statewide contracts unlikely to be affected by local market changes. T. at 198-202. Both Dr. Argue and Dr. Orr agreed that examining physician noncompete agreements on a county-by-county was arbitrary and irrational. Dr. Cory Capps, on behalf of Intervenor, testified that prohibiting physician noncompete agreements has a rational economic basis and that a county-by-

---

[9] During the preliminary injunction hearing, Defendant Moody moved to strike Dr. Argue's testimony as irrelevant. This Court denied the motion. Defendant Moody then renewed her motion in her post-hearing brief. This Court declines to revisit its earlier ruling. The motion is again denied.

county method made reasonable sense. T. at 232, 349-51. Both experts referenced academic studies supporting their positions—indeed, each referenced many of the same studies in support of opposing contentions—but neither expert conducted a detailed empirical analysis of the present case.[10]

Dr. Argue made clear that, in his opinion, the Florida Legislature ought to perform a full antitrust analysis in order to obtain the best solution to the issue. T. at 204:2-3 ("[T]he Florida Legislature can do whatever it wants. I'm only suggesting that to get it right they ought to do that."). But, in the context of the impairment at issue in the present case, the public purpose element of the Contracts Clause analysis does not require the State to choose the best solution, or even a particularly good one. To be sure, the State cannot choose its method on an arbitrary, capricious, or fantastical basis, and the means chosen to serve the identified public purpose must be suited to that public purpose. For example, the Florida Legislature's choice to regulate physician noncompete agreements on the basis of the county in which the services are provided is a reasonable choice embodying a meaningful distinction, even if it is not the most efficient or intuitive choice. Had the Florida Legislature chosen

---

[10] Intervenor attempted to impeach Dr. Argue with a prior case in which his testimony had been stricken because he offered a legal conclusion. T. at 181-83. Plaintiff attempted to impeach Dr. Capps with a prior case in which he had testified in favor of the party whom the case was ultimately decided against, but without any evidence that the court in that case found Dr. Capps to not be credible or qualified. T. at 287-88. Neither attempt is well taken, and this Court assigns no weight to either.

to regulate those agreements on the basis of, for example, the state water management district in which the services are provided, or by proximity to the nearest golf course, those distinctions likely would not survive even the most minimal Contracts Clause scrutiny. Based on the record before it at this stage, this Court cannot conclude the choice of a county-level application of section 542.336 indicates that law does not serve a significant and legitimate public purpose.

Similarly, although it is perhaps not the most elegant solution, the choice to void physician noncompete agreements by statute rather than adopting some more sensitive mechanism to promote competition does not indicate section 542.336 does not serve a significant and legitimate public interest. The record reflects considerable uncertainty regarding the likely effect of noncompete agreements on markets for specialist medical services, especially concerning the particular noncompete agreements at issue in this case. Dr. Argue explained that, if Plaintiff's prices were not competitive, increasing competition could lead to lower prices for patients. T. at 216. Dr. Argue further stated that, although he inferred Plaintiff charged competitive prices, he did not know the prices charged by Plaintiff or its competitors. T. at 198-200. Similarly, Dr. Capps acknowledged enforcing noncompete agreements has both economic benefits and economic costs. T. at 233:4-17. As the factfinder, this Court can resolve conflicts between the testimony of competing experts;

but the record shows that, at best, the expert opinion is mixed regarding the effectiveness and advisability of noncompete agreements for specialist medical services. Both experts opined about the anticipated effects of enforcing noncompete agreements for specialist physicians in general, but neither expert studied the effect section 542.336 would likely have on healthcare access and prices in Florida or in any Florida county. Given that reasonable arguments exist in favor of either alternative, the Legislature could reasonably conclude increasing competition by voiding certain noncompete agreements would have a meaningful, positive effect on access to affordable healthcare. The existence of the vast and nuanced field of antitrust law is itself compelling evidence that the Florida Legislature could reasonably conclude regulating competition is an effective way to improve market fairness and efficiency.

This Court concludes there is a substantial likelihood section 542.336 impairs Plaintiff's employment contracts within the meaning of the Contracts Clause, but that the degree of impairment does not outweigh the significant, legitimate public purpose of section 542.336. Based on the record at the present stage of proceedings, this Court further concludes Plaintiff has not shown section 542.336 is impermissibly designed to serve special interests rather than its ostensible public purpose. This Court therefore holds Plaintiff has not shown a substantial likelihood of success on the merits with respect to its Contracts Clause claim.

"No person shall be . . . deprived of life, liberty, or property, without due process of law . . .." U.S. Const. amend. V. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Due process requires legislation to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so he may act accordingly." *Id.* "Condemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 111. Nevertheless, due process prohibits any "law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). Moreover "the void-for-vagueness doctrine [applies] outside of the First Amendment context only rarely." *Am. Iron & Steel Inst. v. O.S.H.A.*, 182 F.3d 1261, 1277 (11th Cir. 1999).

Plaintiff contends section 542.336 leaves readers wandering in a desert of uncertainty, for three reasons. First, Plaintiff alleges, the absence of a definition for the term "medical specialty" renders the statute unconstitutionally vague. When asked whether a physician must be board certified in a particular field of practice to hold themselves out as a "specialist" in that field, Dr. Orr responded:

> [T]he word "specialist," Your Honor, that's the issue. How do you
> define that? And I think that is an important issue. Board
> certification certainly allows you to do that. I am a subspecialist
> and I'm board certified. However, the practice of that subspecialty
> may be done by others; and if one looks at that from websites and
> other things, even OB/GYNs, the intermixture of that, that's why
> that "medical specialty" word is so difficult for me to determine.

T. at 93-94. Dr. Orr explained that only a board-certified physician may hold themselves out as board certified, but that anyone practicing in a particular field of medicine may advertise that they practice in that field, T. at 95, and any licensed physician may practice in any field of medicine provided they have the requisite skill and training without first having to be board certified in that area. T. at 32:8-14. Second, Plaintiff claims the three-year period of invalidity is unconstitutionally vague because it is unclear at what point it begins and what will happen when it ends. Finally, Plaintiff argues section 542.336 violates due process requirements because it is difficult to reliably verify whether a given entity employs all physicians practicing a given specialty in a given county at any given time, or even if a physician is practicing in a given county at all.

Plaintiff has not demonstrated a substantial likelihood this claim will succeed on the merits. Plaintiff's vagueness claim is not related to any underlying enforcement of section 542.336, such as a breach of contract claim, nor to any chilling of constitutionally protected conduct. *See Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349-50 (11th Cir. 2011)

(describing two paradigms of vagueness claims). Because section 542.336 does not impose criminal penalties, the likelihood of future prosecution is zero. Even if this Court were to apply the void-for-vagueness doctrine, Plaintiff has not shown section 542.336 does not provide an ordinary reasonable person with fair notice of its scope and meaning. Although Plaintiff identifies possible ambiguities in section 542.336, more than mere ambiguity is required before a law runs afoul of the Due Process Clause. *See id.* at 1341 (explaining that the appellant "d[id] not claim that the unclear ordinance chilled protected conduct. Rather, it simply claim[ed] that the municipality violated its right to operate under clear laws.").

Similarly, although vague laws are problematic because they are difficult to comply with, difficulties of compliance do not universally implicate issues of due process vagueness. Plaintiff's third argument is not that compliance is difficult because section 542.336 is vague, but rather that compliance is difficult because the information necessary to determine compliance is burdensome to obtain. The Constitution does not require that a law be simple or inexpensive to comply with. *See, e.g.*, 15 U.S.C. § 78a *et seq.* (2018) (Securities Exchange Act of 1934). The burden of compliance may make a law unwise or inefficient, but it does not render it unconstitutionally vague

This Court concludes Plaintiff has not shown a substantial likelihood its due process claim will succeed on the merits.

V

Finally, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  "[A] classification neither involving fundamental rights nor proceeding along suspect lines" will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.  Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification."  *Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (internal marks and citations omitted).

Section 542.336 neither involves fundamental rights nor proceeds along suspect lines.  Therefore, the appropriate standard of review is rational basis scrutiny.  Although the bar to satisfy this standard is indeed low, it is not *pro forma*, nor is it a matter of course that a law will be upheld.  Applying this standard, courts give serious and meaningful consideration to whether

> there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Nordlinger*, 505 U.S. at 11. Courts have stricken down laws which fail to satisfy the rational basis standard. *See, e.g.*, *Craigmiles v. Giles*, 312 F.3d 220, 228-29 (6th Cir. 2002) (holding unconstitutional a Tennessee law prohibiting anyone other than a licensed funeral director from selling caskets, and noting "[n]o sophisticated economic analysis [was] required to see the pretextual nature of the state's proffered explanations" for the law).

This Court concludes Plaintiff has not shown a substantial likelihood that section 542.336 will fail to satisfy rational basis review. Based on the record before this Court, it appears plausible that the Florida Legislature could have enacted section 542.336 out of concern for the trend of concentration in the healthcare industry and the attendant effects of that trend on access, costs, and consumer choice. *See* ECF No. 60-1 at 3-4 (statement of Sen. Gruters); § 542.336, Fla. Stat. (2019) (stating restrictive covenants regulated by the statute "restrict patient access to physicians, increase costs"). The Florida Legislature could rationally have concluded one way to address those issues was by increasing competition, and that an acceptable way to make progress towards that result was to render void certain noncompete agreements which contributed to creating and maintaining county-level zones of exclusive market share. Applying the bar on noncompete agreements only to the first market participant may be of questionable economic merit, but as a means of facilitating competition it is neither irrational nor arbitrary.

21

The record does not support Plaintiff's claim that section 542.336 "facially targets a few physician specialists, including Intervenor, for special dispensation." ECF No. 62 at 2. Section 542.336 does not mention Intervenor nor any other specific individual. *See generally* § 542.336, Fla. Stat. (2019). It may regulate a class of individuals to whom Intervenor belongs, but there is no evidence before this Court to indicate the potential size of the group section 542.336 affects. It may affect nine physicians, or it may affect hundreds or even thousands of physicians, but the parties have not presented any evidence at this stage from which this Court could make such a determination. This leaves the language of section 542.336 itself, which—although certainly quite specific—is nonetheless of general application and affects any physician who meets its requirements. Moreover, those requirements are not so specific and unique as to permit this Court to infer that the statute's facial neutrality is a pretext to cover an attempt by the Florida Legislature to single Plaintiff out. On the record presently before this Court, Plaintiff has not demonstrated a substantial likelihood its equal protection claim will succeed on the merits.

VI

This Court concludes Plaintiff has not shown a substantial likelihood any of its claims will succeed on the merits. This Court further concludes this factor of the preliminary injunction analysis is dispositive. Accordingly,

**IT IS ORDERED:**

1. Plaintiff's Motion for Preliminary Injunction, ECF No. 3, is **DENIED**.

2. To the extent it is renewed, Defendant Moody's motion to strike Dr. Argue's testimony is **DENIED**.

3. The parties shall proceed with discovery according to this Court's scheduling order. ECF No. 10.

**SO ORDERED on August 21, 2019.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**